COURT OF APPEALS OF VIRGINIA


Present:  Judges Coleman, Willis and Senior Judge Hodges
Argued at Norfolk, Virginia


EUGENE NAKIA HARLEY
                                        OPINION BY
v.       Record No. 1354-96-1    JUDGE JERE M. H. WILLIS, JR.
                                      AUGUST 5, 1997
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                    Thomas S. Shadrick, Judge

          Joseph C. Lindsey (Joseph C. Lindsey, P.C.,
          on brief), for appellant.

          Robert H. Anderson, III, Assistant Attorney
          General (James S. Gilmore, III, Attorney
          General, on brief), for appellee.


     Eugene Nakia Harley appeals his convictions of robbery, two

counts of abduction, and three counts of use of a firearm in the

commission of a felony.  He contends that the trial court erred

in denying his motion for a transcript of a suppression hearing

at state expense.  We hold that the trial court erred but that

the error was harmless.  Accordingly, we affirm the convictions.

                              I.

     Shortly before 9:00 p.m. on December 8, 1994, employees at

the Twin B Auto Parts store in Virginia Beach were preparing to

close the store.  Kevin Jones, who managed the store, was behind

the counter with Marc White.  Dan Disharoon was sweeping the

floor.

     Harley entered the store and pretended to purchase an air

freshener.  When Jones opened the cash register, Harley produced

a handgun and said: "This is a robbery." After ordering Jones, White and Disharoon to the floor, Harley took the money out of the cash register. He then forced the three men to walk to a back room and to lie down. He took money from a box in the back room and fled the store. Shortly thereafter, Jones, Disharoon and White gave Detective Charles Mills detailed descriptions of the robber's appearance and filled out "suspect description" forms.

On January 5, 1996, the Commonwealth provided the defense a detailed discovery response, summarizing the initial on-the-scene report and the victims' descriptions of the robber. The response included a six-photograph lineup that Jones and White had used to identify Harley in July, 1995, and photographs from another lineup shown to the victims in December, 1994. The 1994 lineup contained no photograph of Harley and produced no identification of a suspect.

Prior to trial, Harley moved to suppress his identification by the three victims on the ground that their pretrial identifications in the photo lineup and at the preliminary hearing were made under impermissibly suggestive conditions. On March 5, 1996, the trial court conducted a hearing on the suppression motion. White, Jones and Disharoon all described the circumstances surrounding their pretrial identifications of Harley. Detective Mills and Detective Michael Collins described those identifications as well. The trial court denied Harley's

motion to suppress the identifications.  That ruling is not on appeal.  A court reporter recorded the proceedings.

Thereafter, Harley, an indigent, petitioned the trial court for a transcript of the suppression hearing on the ground that it "is necessary to adequately face these same witnesses at the trials on these matters and to impeach their credibility, if necessary . . . ."  Defense counsel stated that he had not been counsel at the preliminary hearing, and that he could not impeach the witnesses without the suppression hearing transcript.  The trial court denied the request, noting that defense counsel had taken "copious" notes throughout the suppression hearing and had used the hearing "for discovery purposes rather than the sole issue" of the propriety of the pretrial identifications.  It ruled that to provide the defense with a transcript would "thwart the law in Virginia which says there's no discovery in criminal cases . . . ."  Harley was then tried and convicted in a bench trial by the trial judge who had presided over the suppression hearing.

II.

"We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.  Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, see Ross v. Moffitt, 417 U.S. 600 (1974), it has often

- 3 -

> reaffirmed that fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system,' id., at 612. To implement this principle, we have focused on identifying the 'basic tools of an adequate defense . . .' Britt v. North Carolina, 404 U.S. 226, 227 (1971), and we have required that such tools be provided to those defendants who cannot afford to pay for them."

Husske v. Commonwealth, 252 Va. 203, 210, 476 S.E.2d 920, 924 (1996) (quoting Ake v. Oklahoma, 470 U.S. 68, 77 (1985)).

Following a mistrial, the due process and equal protection clauses require that an indigent defendant be provided, free of cost, an available transcript "'when that transcript is needed for an effective defense or appeal.'" Anderson v. Commonwealth, 19 Va. App. 208, 211, 450 S.E.2d 394, 395-96 (1994) (citations omitted).

> In determining whether a defendant needs a free transcript, two factors are relevant: "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript."

Id. at 211-12, 450 S.E.2d at 396 (quoting Britt v. North Carolina, 404 U.S. 226, 227 (1971)).

### VALUE TO HARLEY

The value of a transcript from a prior proceeding "can ordinarily be assumed." Britt, 404 U.S. at 228. See Anderson, 19 Va. App. at 212, 450 S.E.2d at 396 (noting value of mistrial transcript for discovery, trial preparation and impeachment

- 4 -

purposes); White v. Commonwealth, 21 Va. App. 710, 714-15, 467 S.E.2d 297, 299-300 (1996). Moreover, "'[i]n cases whose outcome turns on witness credibility, the potential value of a transcript for impeachment purposes is obvious.'" Anderson, 19 Va. App. at 212, 450 S.E.2d at 396 (quoting United States v. Devlin, 13 F.3d 1361, 1365 (9th Cir. 1994) (reversing trial court decision to deny indigent free transcript of suppression hearing)). Because an indigent defendant need make no "particularized showing" of need for a transcript, Harley's motion for a free copy of the available transcript to assist in impeaching trial witnesses was sufficient. See White, 21 Va. App. at 714, 467 S.E.2d at 299-300 (quoting Britt, 404 U.S. at 228).

## ALTERNATIVE DEVICES

Harley requested the transcript for impeachment purposes. While alternative methods of impeachment may be available, see Edwards v. Commonwealth, 19 Va. App. 568, 571, 454 S.E.2d 1, 2 (1995), "'[a] defendant who claims the right to a free transcript does not . . . bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a Court in hindsight.'" Anderson, 19 Va. App. at 212-13, 450 S.E.2d at 396 (quoting Britt, 404 U.S. at 230).

The Commonwealth contends that Harley received what should be considered a "constructive transcript." Specifically, the Commonwealth argues that (1) its response to Harley's discovery request provided information suitable for both substantive and

impeachment purposes, (2) that the same trial judge presided over both proceedings, and (3) that the trial occurred only eight days after the suppression hearing.

The Commonwealth's production and delivery of documents in response to Harley's discovery request undoubtedly provided useful assistance.  However, the transcript would have afforded a means by which witnesses might have been impeached, independent and apart from other extrinsic evidence.  Thus, the information provided by the Commonwealth through discovery was not substantially equivalent to a transcript of the hearing.  See United States v. Talbert, 706 F.2d 464, 470 (4th Cir. 1983) (finding prosecutor's "open files" policy not substantially equivalent to transcript of mistrial).

We reject the Commonwealth's suggestion that the trial judge's presence at both proceedings in some way lessened Harley's need for the transcript.  At trial, references were made by counsel and witnesses to pretrial hearings and the trial judge acknowledged the testimony of witnesses at the suppression hearing.[1]  However, we reject the notion that a party should be required to depend upon the trial judge's recollection, sua sponte, of testimony from pretrial hearings.  Thus, while the fact that the same judge hears two or more parts of a criminal

_____

[1] In failing to sustain the Commonwealth's objection to references from the defense to a defense witness' testimony at the suppression hearing, the trial judge noted that it would be "highly unusual" to take notice of the earlier testimony, but stated that "I do recall what her testimony was."

proceeding may be relevant in deciding whether an error was harmless, see United States v. Tyler, 943 F.2d 420, 422 (1991), it does not constitute a substitute for a transcript of a pretrial hearing.

The length of time between the hearing and the trial is an important factor in assessing the adequacy of "alternative devices."  See Riggins v. Rees, 74 F.3d 732, 737 (6th Cir. 1996). However, chronological proximity does not, by itself, constitute a substitute for a transcript.  While the trial occurred only eight days after the suppression hearing, that fact alone is meaningless without the demonstrated availability of a time-sensitive transcript substitute.

The suppression hearing was recorded by a court reporter.  A transcript of that hearing was therefore available upon payment of a transcription fee.  A transcript was available to a party having the funds to pay for it.  Because the transcript had significant value as a defensive tool, and because no reasonable alternative device existed, the rule of Britt, Anderson and White required the trial court to make that transcript available to Harley upon timely and adequate motion.  In denying Harley's motion, the trial court erred.

### III.

While we hold that the trial court erred in denying Harley's motion for a transcript, we must determine whether the error was harmless.  See White, 21 Va. App. at 716, 467 S.E.2d at 300.  For

- 7 -

a constitutional error to be harmless, it must be harmless beyond a reasonable doubt.  Id.  Harley admits that the witnesses' testimony "differed [only] slightly at trial," but contends that there were inconsistencies that require reversal of his convictions.  We disagree.

Harley argues that at trial, two of the three witnesses stated that their identifications were only "tentative," whereas Collins testified at the suppression hearing that each of the witnesses made positive identifications.  At the suppression hearing, Collins stated that he showed the photo spread to Jones and White.  At trial, Collins testified that, according to his notes, both Jones and White positively identified Harley.  Jones testified both at the hearing and at trial that when Collins showed him the photo lineup, he could not identify Harley's photograph positively.  White testified at both proceedings that he positively identified Harley's photograph.  Because Collins, Jones and White testified consistently on each occasion, a transcript of their testimony at the suppression hearing would not have aided an attempt to impeach them.

Harley notes that White testified at the suppression hearing that the robber had light brown eyes, but wrote on the suspect description form that the robber had blue eyes.  Harley has brown eyes.  Harley argues that, without the transcript, he was unable to impeach White's in-court testimony concerning his identification of the robber.  However, the following dialogue

occurred during the defense's cross-examination of White at
trial:

> Q. I think you testified in an earlier hearing that
> his eyes stood out to you?
>
> A. Right. Right.
>
> Q. At that point you related to the color of his
> eyes?
>
> A. I don't know so much the color. It's the
> eyes and the face [that] just really stuck
> out.
>
> Q. Okay. Do you recall his eyes -- you put on
> blue?
>
> A. Yes. I put on there blue. Yes.
>
> Q. Do you have any reason to believe your memory
> as being better as to the color of eyes now
> then it would have been at that time?
>
> A. No. Not really.
>
> Q. At that time ten minutes after the incident
> probably would be your best description of
> this gentleman?
>
> A. Yeah. Good as it's going to get.

On redirect examination, White conceded that Harley did not have
blue eyes. However, he adamantly insisted that he had no doubt
that Harley was the person who robbed him.

The record discloses no significant discrepancies between
the witnesses' testimony at the suppression hearing and their
testimony at trial. Thus, denial of the transcript to Harley
worked him no prejudice. The evidence of his guilt was
overwhelming. All three witnesses had ample time to view him as

- 9 -

he committed the robbery, and the descriptions that they gave to the police on the night of the robbery comported with his actual appearance.  At trial, all three witnesses identified Harley as the robber.

The judgment of the trial court is affirmed.

Affirmed.